THE STATE OF MARYLAND *vs.* THE BALTIMORE AND OHIO RAILROAD COMPANY.

*Constitutionality of the Acts of Assembly exacting for the use of the State, one-fifth of the amount received by the Baltimore and Ohio Railroad Company from Passengers over its Washington branch—Such exaction not a Capitation tax—Right of the State to recover from the Railroad in an Action for money had and received—Set-off as a plea to an Action by the State.*

The Acts of Assembly (1832, ch. 175, 1836, ch. 261, 1844, ch. 103, 1845, ch. 370, and 1852, ch. 328,) in so far as they provide that the Baltimore and Ohio Railroad Company shall pay semi-annually to the Treasurer of the State, for its use, the one-fifth of the whole amount that may be received by the company for the transportation of passengers over its road between Washington and Baltimore, are not in conflict with the Constitution of the United States.

The exaction by the State of the one-fifth of the passenger fare collected by the Baltimore and Ohio Railroad Company over the Washington branch, is not a capitation tax, or in any proper sense a tax upon the passenger for the right of transit, but a tax imposed upon the corporation with its consent, and therefore free from all Constitutional objection.

State *vs.* Balt. & Ohio R. R. Co.

Even if the one-fifth of the passenger fare secured to the State under the provisions of the Act of 1832, ch. 175, and its supplements, were a capitation tax unconstitutionally imposed upon passengers, for the right of transit, the railroad company having collected the money in pursuance of their provisions, could not be allowed to retain it as against the claim of the State; and the same may be recovered by the State in an action of *assumpsit* for money had and received.

A State being sovereign is not liable to be sued by an individual or corporation; the right therefore of set-off which is in the nature of a cross suit, does not exist in actions instituted by the State, except where such defence is expressly allowed by statute.

Appeal from the Superior Court of Baltimore City.

The case is stated in the opinion of the Court.

The cause was argued before Bartol, C. J., Stewart, Brent, Maulsby, Grason, Miller, Alvey and Robinson, J.

*Philip Francis Thomas, S. Teackle Wallis, I. Nevett Steele* and *Attorney General Jones,* for the appellant.

Even if the unconstitutionality of the Acts of Assembly in question, were a matter involved in the present issue, there is no ground on which the Court could be justified in pronouncing them unconstitutional.

The Baltimore and Ohio Railroad Company was incorporated by the Act of 1826, ch. 123. By section 14 of that Act, it was empowered to make "lateral railroads in any direction whatsoever" in connection with its main road from Baltimore to the Ohio, and with the same power for the construction and repair of the lateral as of the main roads. By section 23, however, the State reserved to its citizens and companies subsequently incorporated, the right to connect with the Baltimore and Ohio Railroad, "any other railroad leading from the main route to any part or parts of this State" By section 18, the Baltimore and Ohio Railroad Company was prohibited from charging more than three cents

a mile for any single passenger, or more than the same sum per ton of merchandize.

In the winter of 1830, the Baltimore and Ohio Railroad Company applied to the Legislature for its concurrence in a plan proposed by the company, for the construction of a railroad from Baltimore to Washington. The Act of 1830, ch. 158, was accordingly passed.

This Act proving ineffectual, the Act of 1831, ch. 30, was passed.

But this last Act brought no subscribers, and the railroad company, not being able to borrow the necessary funds, came again to the Legislature for relief, which was liberally accorded by the Act of 1832, ch. 175.

By the Act of 1844, ch. 103, the Baltimore and Ohio Railroad Company is authorized to reduce the rate of tolls for passengers, from time to time, in its discretion, so, however, as that the charge between the two cities shall at no time be less, for a single passenger, than $1.50, and that one-fifth of all such passage moneys shall be accounted for and paid into the State treasury as heretofore. The same law also authorizes round-trip tickets at reduced rates, in the discretion of the company, and allows a proportionate reduction in the fare of way-passengers.

The Act of 1845, ch. 370, allows a reduction of fare also, in the discretion of the company, in the case of passengers passing from either of the two cities, or a point beyond either to the other city or a point beyond it—thus covering the case of passengers over a distance who pass over the road as part of a longer route.

The Act of 1852, ch. 328, finally disposes of the whole matter, by withdrawing all limitations whatever upon the authority of the company to reduce the passenger tolls and by authorizing them, in terms, "to regulate the tolls to be paid for the transportation of passengers on the Washington branch of said road, in their discretion, not exceeding the maximum ($2.50) heretofore fixed by law: provided that

one-fifth of the passage money received from the said branch road be accounted for and paid into the State treasury as now required by law." The only legislative restraint therefore which now exists upon the absolute control of the whole matter by the appellee, is the fixed *maximum* which it shall not exceed. Its power to reduce the fare to the lowest figure is absolute, and the only right or benefit secured to or enjoyed by the State, so far as the fare is concerned, is to receive one-fifth of what the company may in its discretion, charge and shall actually receive.

Such was the state of the law, in December, 1868, when the president and directors of the Baltimore and Ohio Railroad Company, approving the report of their finance committee, to the same effect, refused to pay over to the treasurer the arrear of the State's one-fifth of passenger tolls. The committee reported that "the company has not the right to continue to pay this tax:" that "it has not the legal power to apply any portion of its receipts from passengers travelling upon the Washington branch to the payment of this tax: nor can the sum of which the Governor requests payment be considered to be, in any sense, 'the money of the State.'"

As to the unconstitutionality of the statutes under which the State's right to one-fifth of the passenger tolls arose, the company relied upon an opinion of its eminent legal adviser, the senior counsel of the appellee here, which mainly rested for its conclusions upon the case of *Crandall vs. Nevada*, 6 *Wallace*, 35. Upon that case the learned Judge of the Superior Court rested his opinion.

This case differs widely from the *Nevada* case. The laws in question were a contract made with the company by the State, at the urgent entreaty of the company and for its aid and benefit. They constituted a contract, not merely because Acts of incorporation are from their nature contracts, but because they were supported by good and valuable consideration ; because they were eminently fair and just; because the company not only solicited but joyfully accepted them, and

built and finished, and has enjoyed the profits of its road under them and by means of them. The right to one-fifth of the gross receipts from passenger fare was given to the State in exchange for a valuable privilege and option which it parted with, upon that consideration, and on the company's urgency. Though now called a "capitation tax," it was reserved as the foundation of a proper sinking fund to provide reimbursement to the State for the public moneys·expended, upon the company's solicitation, and for its benefit.

But, it is contended that under the decision in the *Nevada Case*, 6 *Wallace*, 40, and the language used by Chief Justice Taney in the *Passenger Cases*, (7 *Howard*, 283,) as the burden of the exaction falls, here, on the passenger, it is practically a tax on him, and therefore a restraint on his constitutional rights. *Non sequitur.* The usual fare exacted by any railroad company would, if this were true, be unconstitutional. But it is not true. The American citizen has a right to travel, but certainly it is not his constitutional prerogative to travel free. Nor is he constitutionally aggrieved because the rates of fare happen to be exorbitant. They always are, where there is a monopoly, and yet he cannot help himself. Nor are his constitutional rights any the more invaded because the State receives a share of the fare he pays, than if it were received by a private or corporate person other than the State, provided the fare be exacted as fare, and the State's share is compensation for her part in furnishing him the railroad conveniences for which fare is properly payable and exacted. A State might build a railroad herself, and receive the whole of the fare, and make it a high fare also, if she chose, without thereby making the fare a "capitation tax" and unconstitutional.

Besides, the Supreme Court, in the *Nevada Case*, 6 *Wallace*, 39, makes it an element of the sort of "tax" which it pronounces unconstitutional, that it should require each traveller to pay "a specific sum to the State," for the exercise of the right of transit. Here there is no "specific sum" named

or set. The company fixes its own fares, at its own rates, and is only restrained by a fixed maximum.

The legislation in question imposes no tax, and creates no unconstitutional exaction, but simply embodies a fair and valid contract between the State and the appellee, whereby the latter agreed, for good and valuable consideration, to pay to the State a portion of its receipts, and the State, on its part, and at the request of the appellee, surrendered, in exchange therefor, a valuable privilege, by the concession of which the appellee had originally tempted the State into the common enterprise. The State is entitled to every intendment in favor of the constitutionality of the laws in question, not only on the grounds which usually control such questions, but because of all the circumstances surrounding the particular legislation. *Mayor, &c., vs. Balt. and Ohio R. R. Co.*, 6 *Gill*, 291, 298; *Ohio Life Ins. Co. vs. DeBolt*, 16 *How.*, 435–437; *Gray vs. Bennett*, 3 *Metc.*, 522; *Lane County vs. Oregon*, 7 *Wallace*, 80; *Dartmouth College vs. Woodward*, 4 *Wheat.*, 592, 593, 594, 627, 629, 630; *Dwarris on Statutes*, 9 *Law Library*, 39–42, 44, 45, 60; *Passenger Cases*, 7 *Howard*, 402, 403, 409, 483; *State Bank of Ohio vs. Knoop*, 16 *Howard*, 378, 381, 389, 391; *Gordon vs. Appeal Tax Court*, 3 *Howard*, 145; *Searight vs. Stokes*, 3 *Howard*, 179.

But the constitutionality or unconstitutionality of the laws in question is not in any way involved in the case at bar, and the first prayer of the appellee ought to have been rejected, on that ground, as well as on the merits of the legal proposition which it embodies. The appellee's second prayer should have been refused on the same ground of irrelevancy to the issue, even if it had not asked an instruction that the State was not entitled to recover. In an action for money had and received like this, and under the conditions stated in the appellant's prayers, both of the instructions asked by the appellant should have been granted.

There is no pretence of any intentional violation of the Constitution. The unconstitutionality alleged is not sup-

posed to arise from the breach of any particular provision of that instrument, but only from violation of its general scope and spirit. There is, therefore, no *turpis contractus* to be discussed upon this record; no public policy which demands the confiscation of the State's moneys in the hands of the company, as a warning to evil-doers. The company simply has in its hands moneys which it confessedly collected and received for the State, and as her agent, from parties who set up no constitutional objection to paying it, but paid it voluntarily, are not asking that it be returned to them, and could not recover it back if they would.

The law upon this point is stated in *Paley on Agency*, 28 *Law Lib.*, 62, 63, (*marg.*,) and cases cited.

The doctrine laid down by PALEY is fully sustained by the Supreme Court of the United States, in the cases of *McBlair vs. Gibbes*, 17 *How.*, 236; *Brooks vs. Martin*, 2 *Wallace*, 79.

This Court itself has decided that a collector who has received State taxes cannot set up the unconstitutionality of the tax as a defence to the State's recovery. *Waters vs. The State*, 1 *Gill*, 308; *Dumot vs. Jones*, 2 *Wallace*, 9; *Coursey vs. Covington*, 5 *Har. & John.*, 47; *Sharp vs. Taylor*, 2 *Phillips' Ch.*, 817, 818; *Tenant vs. Elliott*, 1 *Bos. & Pul.*, 3; *Farmer vs. Russell*, 1 *Bos. & Pul.*, 296; *Thompson vs. Thompson*, 7 *Vesey*, 473.

The State is sovereign and cannot be sued in its own Courts. This immunity belongs to it, both as a matter of prerogative and upon grounds of public policy. By the Act of Assembly of 1786, ch. 53, the right to sue the State was given to those who claimed to be its creditors, but no such right existed prior to that time. This Act was found so inconvenient in its practical results, that by the Act of 1820, ch. 210, it was repealed. The State then resumed and has ever since retained her original immunity. *Tiernan vs. Rescaniere*, 10 *Gill & John.*, 225; *Plater vs. Scott*, 6 *Gill & John.*, 121; *State vs. Bank of Maryland*, 6 *Gill & John.*, 225, 226, 227.

A. set-off is a cross-suit or action, and cannot be maintained against the State, for the same reasons which forbid an original suit. Whether the action be original or cross, it is equally an attempt to *coerce* the sovereign to do justice, and the principles of the common law do not permit a sovereign State to be thus subjected to coercion by its own tribunals. It is presumed to be always ready to do justice voluntarily. So in regard to public policy, set-offs and suits against the State equally tend to delay and embarrass it in the collection of its revenue, and to substitute the Courts for the Legislature and the public officers to whom the Constitution has confided the disbursement of the public money. *Commonwealth vs. Matlack,* 4 *Dallas,* 303; *Chevellier vs. State,* 10 *Texas,* 315; *Treasurer vs. Cleary,* 3 *Richardson,* 372; *Wilson vs. Lewiston,* 1 *Watts & S.,* 428; *Commonwealth vs. Rhodes,* 5 *Monroe,* 318; *State vs. Northern Central Railway,* 18 *Md.,* 193; *Constitution of* 1867, *Art.* 3, *sec.* 32; *Art.* 6, *sec.* 2.

To entitle a defendant to a set-off, his claim must be such, that he could sue upon it in a Court of law and recover. This is one of the tests by which the right to a set-off must be tried. In this case, the defendant's claim was one upon which it will not be pretended that a suit at law could be maintained. The only remedy upon it was by petition to the Legislature. *Milburn vs. Guyther,* 8 *Gill,* 93, 94, 95.

Set-off is a statutory remedy given to the defendant against the plaintiff in a pending suit.

The object of the set-off is to prevent circuity of action. As no action will lie against the State, there is in this case no circuity of action to be prevented, and the effect of holding the State to be within the statute, would be not to prevent circuity of action, but to give to the defendant a right of action, by means of set-off which he did not originally possess.

It is well-settled that general terms in a statute do not embrace the State. Laws are made ordinarily for the citizen, and not for the sovereign. To include the State within the operation and binding effect of a statute, the State must either

be expressly named, or there must be a clear and inevitable implication from the language of the statute, that it was intended to embrace the State. The statutory provisions on the subject of set-off in this State, are sections 12 and 13 of Article 75 of the Code. They do not expressly name the State, and there is no ground whatever for any implication that they were intended to embrace the State. *State vs. Milburn,* 9 *Gill,* 108, 109, 118, 119; *United States vs. Hoar,* 2 *Mason,* 312.

*Charles J. M. Gwinn, John H. B. Latrobe* and *Reverdy Johnson,* for the appellee.

The requirement made by the Act of 1832, chapter 175, section 8, to pay the money therein referred to, into the treasury of the State of Maryland, is unconstitntional and void, because it imposes a tax upon every person traveling upon the Washington branch road of the defendant, which tax is required to be collected by the company, and to be by it paid into the treasury of the State.

Every citizen of the United States, being a citizen and resident of any particular State, has a right to travel into or through any other State, without paying for such privilege of·entry or transit, any tax or charge to the State into or through which he shall so travel. For being a citizen of another State, and subject to its jurisdiction and taxing power, and not being temporarily a resident even of the State into which he may enter for a purpose of travel or transit only, he cannot constitutionally be taxed by such State.

Such a power of taxation was substantially denied to the Confederated States in the original Articles of Confederation; for therein it was declared that " the people of each State shall have free ingress and egress to and from any other State;" and it cannot be supposed that the Constitution of the United States intended to leave a larger power in the States, over citizens of other States, than was conferred by the Articles of Confederation. *Articles of Confederation, Art.* 4. See *McCullough vs. The State of Maryland,* 4 *Wheaton,* 316, as showing

the limit and subject of the taxing power of a State; also *Howell vs. State*, 3 *Gill*, 23, and *The Passenger Cases*, 7 *Howard*, 492.

It is asserted that the arrangement contained in the Act of 1832, chapter 175, was a mere *contract*, by which the railroad company agreed to pay to the State, in each year, in consideration of receiving certain concessions, a stipulated portion of its gross receipts; and that such arrangement can not rightfully be considered as imposing a tax either upon the corporation or upon the passengers; but that if it could be considered as a tax, it must be held to be a tax not upon the *passenger*, but upon the *corporation*, and as amounting, *pro tanto*, to a waiver of the exemption from taxation secured to the company by the Act of 1826, chapter 123, section 18.

It was not a simple agreement to pay to the State a portion of the gross receipts of the company. It was, on the contrary, a provision of law by which the State gave power to the company to increase the amount of its gross receipts from each passenger, in order that a portion of such increase should be so received for the use of the State, and should be paid into the treasury of the State. It operated as a direct tax upon the passenger, and this unconstitutional exercise of power cannot be accomplished by a form of contract with a company engaged in the transportation of passengers. Nor was the Act intended to operate as an agreed tax imposed upon the *company* by its own consent; for it authorized such rates of charge as left the company, if it exercised its powers, in the possession of larger revenues, after paying the tax, than it had under the privilege of complete exemption, which it enjoyed before the passage of the Act of 1832, chapter 175. It was an agreed tax, but it was imposed on those who were not parties to the agreement.

The revenue thus derived by the State was not a *dividend* upon any investment in the company. The State had subscribed to the special stock of the Washington branch road under a separate and distinct contract, authorized in the Act

23         v. 34

of 1832, chapter 175, section 1, and was authorized to receive its share, as a stockholder, of the net profits of the branch road (1832, chapter 175, sections 2 and 3); but a share in the gross receipts made no part of any legal dividend.

The revenue thus derived by the State was not *interest* payable upon any debt, because the State was not in fact a *creditor* of the Washington branch road. It was not a semi-annual price or *bonus* paid by the company for the privilege of constructing the road, and operating it in connection with a road built under the authority of Congress, for the price was not in fact paid by the company. It was paid by those who travelled upon the road, as a part of the price of their journey, although it enured to the exclusive use and benefit of the State. If the money secured to the State by the operation of the Act of 1832, chapter 175, section 8, was neither dividend, interest nor bonus, what then was it? It was a tax imposed by the State upon every passenger travelling upon the Washington branch road.

The general argument that the tax imposed by the Act of 1832, chapter 175, &c., if it be conceded that a tax is thereby imposed, is a tax upon the company, and one to which it has given its corporate assent, and not a tax upon the passengers, is answered by the case of *State vs. Mayhew*, 6 *Gill*, 495, and is identical, moreover, in kind with that insisted upon by this State in the case of *Brown vs. State of Md.*, 12 *Wheaton*, 419.

In the case of *Crandall vs. State of Nevada*, 6 *Wallace*, 35, it was asserted, on the part of the State, that the tax imposed was levied on the carrier, or person engaged in the business of transportation, not upon the passenger.

But the Supreme Court said: " If the Act were much more skilfully drawn to sustain this hypothesis than it is, we should be very reluctant to admit that *any form of words, which had the effect to compel every person travelling through the country by the common and usual modes of public conveyance, to pay a specific sum to the State, was not a tax upon the right thus exercised.*"

The Court having reached the conclusion that the Act in question did in fact impose a tax on the passengers, for the privilege of leaving the State, or passing through it by the ordinary means of passenger travel, and after recognizing in this case, as in the *Passenger Cases*, that the tax was demanded from other persons than the passengers only for convenience of collection, decided after careful consideration, that the Act was in conflict with the Constitution of the United States, and therefore void.

The legislation of the State of Maryland, which it has become the duty of the appellee to contest in this cause, is inoperative and void for the general reason, it assumes a control over the intercourse between the various sections of the United States, and thus limits a privilege belonging to the citizens of the several States, which it was the purpose of the Constitution to leave subject to no other supervision than the national authority. For this reason, alone, the legislation referred to would be invalid, even if it were not open to the specific objections already made. *Cooley vs. Board of Wardens*, 12 *How.*, 319; *Steamship Co. vs. Port Wardens*, 6 *Wallace*, 32; *Hinson vs. Lott*, 8 *Wallace*, 152.

The Supreme Court, in its latest adjudications upon the questions involved in this discussion, has reaffirmed the case of *Crandall vs. State of Nevada*. See *Woodruff vs. Parham*, 8 *Wallace*, 138, Justice MILLER; *Hinson vs. Lott*, 8 *Wallace*, 152, Justice MILLER.

And since, in the case of *Crandall vs. State of Nevada*, the judgment of the Court rested in great part upon portions of the able opinion of Chief Justice TANEY, in the "*Passenger Cases*," and gave to that opinion, to the extent of the principle involved in this case, the force of authority, it is submitted that this opinion, enforced by the case of *Crandall vs. State of Nevada*, may well be accepted as conclusive of this case.

The Acts of 1836, chapter 261, section 7; 1844, chapter 103, sections 1, 2 and 3, and the Act of 1852, chapter 328,

do not in anywise obviate the constitutional objection to the validity of the Act of 1832, chapter 175, section 8.

These later Acts do not change the substantial nature of the arrangement made between the State and the Baltimore and Ohio Railroad Company, except by substituting an *ad valorem tax* for a *specific duty.* The effect of these amendatory Acts was·equally to " add to the price of the article ;" and the tax thus levied was, in fact, paid by the passenger in like manner as a direct tax levied upon himself would have been paid. *Brown vs. State of Maryland,* 12 *Wheaton,* 419.

The Superior Court was, moreover, right, in granting the first prayer of the appellee, because the Act of 1832, chapter 175, section 8, and the Acts amendatory of, or supplementary to its provisions, already cited, authorize a charge *within the District of Columbia,* which is not sanctioned by the Act of Congress of March 2d, 1831, and because these Acts do impose a tax for the use of this State, upon persons travelling from point to point *in the District of Columbia,* although such persons are not resident citizens of this State, and do not journey upon its territories.

Although the appellee has charged and received $1.50, for the transportation of each passenger for the whole distance between Baltimore and Washington, over its branch road, and has, up to the 30th day of June, 1868, accounted for and paid to the treasurer one-fifth of the gross receipts from passengers on said road, it is not estopped from denying the constitutionality of the Acts, referred to in the first prayer of the appellee, in so far as they contain the objectionable provision, which has·been already discussed, and the Court committed no error in granting the appellee's second prayer.

This proposition is fully maintained by the case of the *Pennsylvania, Delaware and Maryland Steam Navigation Co. vs. Dandridge,* 8 *G. & J.,* 248, 319, 320.

In opposition to this view, it is contended that if the Baltimore and Ohio Railroad Company be correct in assuming that the payment required by the Act of 1832, ch. 175, sec-

tion 8, and by the Acts supplementary thereto or amendatory thereof, is a tax, the payment of which is imposed upon the company as a statutory duty, it is, nevertheless estopped from setting up the unconstitutionality of these provisions of law, by reason of certain familiar principles of law recognized in the case of *Waters, et al. vs. State,* 1 *Gill,* 302.

In that case the defendant was a collector of taxes only, and had no other right or authority to collect the money which he had received than was conferred by his particular office of tax collector. He had no personal right to any part of the money collected, and he was not at liberty to deny the right of the State to the money which had been collected only by his practical assertion of the existence and validity of such right.

The facts in this case, now under discussion, are widely different, and the case cited can furnish no guide to the judgment of this Court. The appellee is not a collector of taxes for the State, and it has a right to retain the money received, as its own property, if the claim of the State is invald. The appellee cannot be regarded as a collector of taxes. *The State vs. Mayhew,* 2 *Gill,* 495, 496.

The appellant insists that even if the Act of 1832, ch. 175, section 8, as modified by subsequent Acts of Assembly, is held to be unconstitutional, because it imposes a tax on passengers travelling on the Washington branch road, yet that, nevertheless, the appellant is entitled to recover, under its count for money had and received, as explained by the bill of particulars, one-fifth of the gross amount received by the defendant for the transportation of passengers upon the said branch road, which may not have been already paid by the appellee to the State.

It is believed that this prayer is based upon the theory that the case, now under discussion, is within the ruling made by the Court of Appeals in *Waters, et al. vs. State,* (1 *Gill,* 302,) already referred to.

The reasons given in support of the second prayer of the appellee suffice to maintain the propriety of the rejection by the Superior Court of the first prayer of the appellant.

The appellant further insists that if the appellee accepted the terms of the several Acts of Assembly, relating to the rate of fare for the transportation of passengers on its road, between Baltimore and Washington, and relating to the payment to the State of one-fifth of the said fare, and received, between December 31st, 1859, and December 31st, 1869, any sum of money for said transportation, the appellee is entitled to recover one-fifth of the sum so received, and not already paid to the appellant, without regard to any question of conflict between the said Acts, or any of them, and the Constitution of the United States.

This prayer is based upon the theory that where a contract in which two or more parties are engaged was illegal, but has been carried out, a partner, in whose hands the profits are, cannot refuse to account for and divide them, on the ground of the illegal character of the original contract. Such is alleged to have been the ruling of the Supreme Court in the cases of *McBlair vs. Gibbes,* 17 *Howard,* 232, and in *Brooks vs. Martin,* 2 *Wallace,* 78, and in the cases cited by the Supreme Court in those decisions.

This has not been the ruling upon the same question in this State. *Stewart vs. McIntosh,* 4 *H. & J.,* 239, 240; *Schwartze vs. Tyson,* 4 *H. & J.,* 290; *Chappell and Stansbury vs. Wysham,* 4 *H. & J.,* 562; *Hall vs. Mullen,* 5 *H. & J.,* 193; *Roberts vs. Gibson,* 6 *H. & J.,* 127; *Dill vs. Ellicott, Taney's C. C. Decisions,* 236; *Bank of the U. S. vs. Owens,* 2 *Peters,* 527, See also *Chitty on Contracts,* ('0th *Am. Ed.,*) 731, 732, notes i and k; *Froar vs. Nichols,* 2 *C. B.,* 501, 512; *Simpson vs. Bloss,* 7 *Taunt.,* 246; *Holman vs. Johnson, Cowper,* 343; *Parsons vs. Thomson,* 1 *H. Bl.,* 322; *Armstrong vs. Toler,* 11 *Wheat.,* 258; *Collins vs. Blantern,* 2 *Wilson,* 341.

But the appellee is not compelled to rely upon these authorities in order to maintain the proposition that the Superior Court was right in rejecting the second prayer of the appellant.

The case of *Brooks vs. Martin* rests upon the theory that the whole contract was illegal, but that it did not lie in the mouth of the partner, who had, by fraudulent means, obtained possession of the funds, to refuse to do equity to his other partners, because of the wrong originally done or intended, and then wholly consummated.

This case is marked by no such feature. The appellee had, under the Act of 1832, ch. 175, section 7, and under the Act of Congress already alluded to, a distinct, separate and specific right to charge and take the fares, therein mentioned, or provided for, for conveying each passenger upon the Washington branch road. This right, secured by the particular section of the Maryland Act alluded to, remains good and valid, even if other parts of the same statute be invalid. *Davis vs. The State,* 7 *Md.*, 160; *Mayor and City Council of Hagerstown vs. Dechert,* 32 *Md.*, 384.

BARTOL, C. J., delivered the opinion of the Court.

The questions presented by this appeal are of very great interest and importance; more on account of the character of the parties, and the large amount of money involved, than by reason of any intrinsic difficulty in the questions themselves. These depend for their solution upon plain and familiar principles of law, which are not affected in their application either by the amount in controversy or the dignity and power of the parties litigant.

The action is *indebitatus assumpsit,* instituted by the appellant against the appellee on the 6th day of May, 1870.

The declaration contains a count " for money had and received by the defendant for the use of the plaintiff."

In answer to the defendant's demand for a bill of particulars, the plaintiff's claim was stated to be " for five hundred

thousand dollars, ($500,000,) being the one-fifth part of the whole amount of moneys received by the defendant for the transportation of passengers upon the Washington branch of the Baltimore and Ohio Railroad, from the 1st day of January, 1860, to the 1st day of January, 1870; which said sum of $500,000 was received by the defendant for the use of the plaintiff, and was due and in arrears to the plaintiff at the time of the institution of this action."

The defendants plead "that they never were indebted as alleged by the plaintiff," and also filed a plea of set-off.

To this second plea there was a demurrer, which was sustained by the Court below. Issue being joined on the first plea, a verdict was rendered in favor of the defendant under the instructions of the Superior Court, and from the judgment thereon this appeal has been taken.

It appears from the bill of exceptions that the plaintiff offered in evidence the Acts of the General Assembly of Maryland, containing the charter of the defendant, all the Acts of Assembly relating to the construction of a railroad between the cities of Washington and Baltimore, and to the payment to the plaintiff by the defendant of one-fifth part of the whole amount which may be received by it from the transportation of passengers on the said branch road, and all other Acts applicable in the premises; that these Acts were accepted by the defendant, and the branch road completed and put in operation under them in the year 1835. Also offered in evidence statements made from the books of the defendant, showing the whole amount of money so received by the defendant for the transportation of passengers, and the portion thereof paid to the State on account of said one-fifth, during the period covered by the bill of particulars, showing an apparent balance unpaid on the 1st day of January, 1870, of $316,871.43. Evidence was then offered showing that the fare charged and received from passengers on the branch road during the whole period of time covered by the bill of particulars, was $1.50 for each passenger between Washington

and Baltimore, and at the same rate for shorter distances; and that from the time of the completion of the branch road down to the 1st day of January, 1868, the defendant had annually rendered an account purporting to show the gross amount received for the transportation of passengers, and the State's proportion thereof; and had made semi-annual payments in January and July in each year on account of the same, to the Treasurer of Maryland, down to the 1st day of July, 1868.

After the testimony on the part of the plaintiff had been closed, two prayers were offered on the part of the defendant, stating substantially :

1st. That the several Acts of Assembly, so far as they provide for the payment by the defendant to the treasurer for the use of the State, of one-fifth of the money received for the transportation of passengers on the branch road, are unconstitutional, because in conflict with the Constitution of the United States.

2d. That the defendants are not estopped from denying the constitutionality of said Acts, by reason of their having charged and received $1.50 for the transportation of each passenger for the whole distance over the branch road, and accounted with and paid to the treasurer one-fifth of the gross receipts from passengers on said road up to the 30th day of June, 1868, and that the plaintiff was not entitled to recover.

These prayers were granted by the Superior Court. It thus appears that the defence to the action rests entirely upon the alleged ground that the several Acts of Assembly, whereby the obligation was assumed by the company to pay to the State Treasurer, the one-fifth of the gross amount received from the passenger fare on the railroad, are inoperative, because in conflict with the Constitution of the United States.

The argument urged in support of this position is that the operation and effect of such a contract between the company and the State is to impose a capitation tax upon passengers,

to the amount of one-fifth of the railroad fare charged by the company; which, to that extent, is a tax upon the right of citizens to travel through the State, and is a violation of the Constitutional rights of the citizen under the decision of the Supreme Court in *Crandall vs. Nevada,* 6 *Wallace,* 35.

This Constitutional question has been fully argued, and has received the consideration by this Court which its importance demands; and before concluding this opinion we propose to explain the grounds upon which we think the contract between the State and the railroad company is free from all Constitutional objection.

But before taking up that question it is proper to say that in our judgment the rights of the parties in the present suit do not, by any means, necessarily depend on its solution.

If, as we think, the legislation of the State in question is constitutional and valid, the defence relied on by the appellee fails, and the judgment must of course be reversed. But if, for the purposes of the present case, it be conceded that the defendant's position upon the Constitutional question is correct, that the effect of the Act of 1832, and its supplements, is to impose upon passengers a capitation tax, collected from them by the railroad company for the use of the State, above and beyond the mere charge for transportation, (and upon that ground alone is it contended that the one-fifth of the money paid by the passengers is an unconstitutional tax;) and if in point of fact a sum of money so collected has actually been received by the company, then it is money collected not for itself, but for the use of the State, and the question arises whether it is competent for the company to set up as a defence to the action brought by the State, for the recovery of the money so received, that the Acts of Assembly under which it was collected were unconstitutional. That is the question raised by the prayers offered by the plaintiff, which were refused by the Superior Court.

They assume for the purposes of the present case that the money collected from passengers for the use of the State was

an unconstitutional exaction from them, as alleged by the defendant, and yet assert the proposition that this furnishes no defence in the present suit ; and that the plaintiff is entitled to recover one-fifth of the gross sum actually received for the transportation of passengers, and not already paid to the plaintiff " *without regard to any question of conflict between the Acts of Assembly and the Constitution of the United States.*" Or to state the proposition more plainly, that the railroad company having collected certain moneys from passengers for the use of the State, cannot be allowed to retain the money, and refuse to pay it to the party to whom it belongs, on the plea that the persons from whom it was collected were not legally bound to pay it. In our opinion this proposition is a sound one, consonant with the plainest principles of reason and justice, and supported by an unbroken current of decisions.

This action is *indebitatus assumpsit,* upon the implied promise of the defendant to pay to the State the money collected for its use : the receipt of the money for the plaintiff's use being the ground of the action from which the implied promise springs.

In such case the question of the validity of the law under which the money was collected cannot properly arise. That is a distinct and collateral question which might have been raised by the persons from whom the money was collected, but cannot be successfully urged by the railroad company in answer to the suit of the State. Of course we are not to be understood as maintaining the proposition, that the legal rights of parties are dependent upon the mere form of action adopted, or that it is competent by resorting to an action upon an *implied assumpsit,* to enforce a contract, which could not be enforced by an action brought on the express contract. Such an evasion is not tolerated by the law, which does not allow that to be done indirectly which cannot be done directly. But if the foundation of the suit be something collateral to the illegal contract or transaction, and the plaintiff is not

obliged to resort to this in order to maintain the suit, or to derive any aid from it, then the illegality of the original transaction is not a defence to the suit.

There is a broad and well recognized distinction between suits to enforce illegal contracts, and those asserting title to money arising from them. We shall presently cite some authorities in support of this general proposition. But first let us examine more particularly the nature of the arrangement between the State and the railroad company, and see in what its supposed unconstitutionality is alleged to consist. There is no pretence of any intentional violation of the Constitution, nor is there any express provision of that instrument to which the State laws are repugnant, it is said they are in conflict with its general scope and spirit. This is then not a case of *turpis contractus.*

The defence here urged is, that under its contract with the State, the company has added the moneys for the State's account, to the fares it collected for itself, and thus collected from passengers a capitation tax for the use of the State, which could not be constitutionally imposed. Now if this be so, the illegality of the transaction consisted entirely in the supposed unconstitutional exaction from the passengers; they were the only parties whose constitutional rights were invaded; they having waived the question of legality and paid the money voluntarily to the railroad company, cannot recover it back, This position is settled by numerous authorities, among them we cite *Lefferman vs. Mayor, &c.,* 4 *Gill,* 425; *Morris vs. Mayor, &c.,* 5 *Gill,* 248; *Balt. & Sus. R. R. Co. vs. Faunce,* 6 *Gill,* 76; *Lester vs. Mayor, &c.,* 29 *Md.,* 415. That a party may waive a constitutional provision which applies in his favor, was decided in *Baker vs. Braman,* 6 *Hill,* 48, cited and approved by the Supreme Court in the recent case of the *Philadelphia, Wilmington & Baltimore R. R. Co. vs. Trimble,* 10 *Wallace,* 382.

The question then is, shall the defendant be allowed to retain the money as against the claim of the State?

It is certainly true that the Courts of justice do not lend their aid in the enforcement of illegal or unconstitutional contracts. But in the aspect in which the defence in this case is presented, the contract between the State and the company, if obnoxious at all to objection on constitutional ground, can only be so in respect to the collection from passengers of the one-fifth of the fare for the use of the State. It is perfectly clear that when the money has actually been collected by the company, that part of the transaction which is supposed to be unconstitutional has been completed; the illegal contract has been performed and is at an end, and in no manner enters into the question which subsequently arises between the railroad company and the State, as to the duty and obligation of the company to pay over the money to the State for whose use it was collected, and to which it belongs. To that part of the company's contract there remains no constitutional objection, and it is no answer to the suit of the State, instituted to inforce its payment by the company, that it was an unconstitutional tax upon the passengers.

A point very analogus to this was expressly decided in *Waters vs. The State*, 1 *Gill*, 302. It was there held, that a collector who has received State taxes cannot set up the unconstitutionality of the tax as a defence to the State's recovery. "Having admitted," says Judge ARCHER, p. 308, "the receipt of the money, the collector, who is in the light of an agent of the State, could not be heard to urge in his defence to a suit, that the money he had received was on account of taxes which the Legislature had no constitutional power to impose."

In *Paley on Agency*, 28 *L. Lib.*, 62, the general principle is thus clearly and correctly stated:

"If money has been actually paid to an agent for the use of his principal, the legality of the transaction, of which it is the fruit, does not affect the right of the principal to recover it out of the agent's hands. For though the law would not have assisted the principal, by enforcing the recovery of it

from the party by whom it was paid, because it is the policy of the law not to aid the completion of an illegal contract, yet when that contract is at an end, the agent, whose liability arises solely from having received the money for another's use, can have no pretence to retain it."

This doctrine is fully sustained by a number of adjudged cases, some of which are cited by the author. In *Tenant vs. Elliott*, 1 *B. & P.*, 3, the defendant being a broker, effected an illegal insurance for the plaintiff on his ship. The ship being lost, the underwriters paid the amount of the insurance to the defendant, who, without any intimation from them to retain the money, refused to pay it over to the plaintiff. In deciding the case, BULLER, Justice, said: "Is the man who has paid over money to another's use to dispute the legality of the original consideration? Having once waived the legality, the money shall never come back into his hands again, can the defendant then in conscience keep the money so paid? For what purpose shall he retain it? To whom is he to pay it over but to the plaintiff?" Chief Justice EYRE said, in the same case: "The defendant is not like a stakeholder. The question is, whether he who has received money to another's use, on an illegal contract, can be allowed to retain it, and that not even at the desire of those who paid it to him? I think he cannot." In *Farmer vs. Russell*, in the same volume, 295, the same principle was decided, and was recognized by Lord Chancellor COTTENHAM in *Sharp vs. Taylor*, 2 *Phillips' Chan. Rep.*, 817, 818, and by Sir WM. GRANT, M. R., in *Thompson vs. Thompson*, 7 *Vesey*, 473.

These cases have been cited and approved, and the same principle has been followed by the Supreme Court in *McBlair vs. Gibbes*, 17 *How.*, 236, 237, and in *Brooks vs. Martin*, 2 *Wallace*, 70. In the case last cited, the bill was filed by one partner to recover his share of the profits of a partnership entered into for the purpose of buying soldiers' claims in violation of an Act of Congress. The Court say, (p. 79,) the traffic in which the firm was engaged was illegal; and yet the

bill was maintained upon the ground that the illegal contract had been completed and was at an end, and the suit was brought to recover the plaintiff's share of realized profits. The opinion of Lord COTTENHAM in *Sharp vs. Taylor,* 2 *Ph. Ch.,* is quoted at great length, citing the cases of *Tenant vs. Elliott, Farmer vs. Russell,* and *Thompson vs. Thompson,* as showing the difference between enforcing illegal contracts and asserting title to money which has arisen from them. The Court then say, (p. 81,) " These cases are all reviewed in the opinion of this Court in *McBlair vs. Gibbes,* 17 *Howard,* 232, and the language here quoted from the principal case is there referred to with approbation. We are quite satisfied the doctrine thus announced is sound, and is directly applicable to the case before us."

We need only add that the principles upon which those cases rest, and which have thus received the unqualified sanction of the Supreme Court, appear to us to be consonant with reason and justice, and fully sustain the position taken by the appellant on the question now under consideration.

In respect to the one-fifth of the money actually received from passengers by the defendant, which this suit was instituted to recover, as we have before said, the right of the plaintiff to recover does not depend upon the question of the constitutionality of the Acts of Assembly; for assuming the appellee's views upon that question to be correct, this furnishes no defence to the present suit.

For these reasons, we are of opinion the prayers of the appellant ought to have been granted.

In the view we have taken of this case, as it is presented by the pleading and upon the prayers of the plaintiff, it may, perhaps, be unnecessary to express any opinion upon the constitutional question ; but as that is presented by the defendant's prayers, has been fully argued and has received our careful consideration, and as our silence on a matter of so much interest and importance might lead to some misapprehension with respect to the opinion entertained by this Court,

we consider it proper to state some of the reasons which have led us to the conclusion that the legislation of the State now called in question, is nowise in conflict with the Constitution of the United States.

In the preceding part of this opinion, we have treated the case as the plaintiff has chosen to present it, assuming the hypothesis of the defendant's prayers to be correct, and have shown that it does not affect the right of the plaintiff to recover in the present suit. But in our judgment this hypothesis is erroneous, and rests upon a misconstruction of the Acts of Assembly. It seems to us to be a great error to suppose that the arrangement between the State and the railroad company, under which the branch road was constructed and went into operation, and the company has enjoyed its franchise; whereby the company for valid and sufficient considerations contracted to pay the State a portion of its gross receipts from the transportation of passengers, can be fairly construed as imposing an unconstitutional tax upon passengers within the decision of the Supreme Court in *Crandall vs. State of Nevada,* 6 *Wallace,* 35.

That case arose in this way. The Legislature of Nevada, in 1865, enacted "that there should *be levied and collected a capitation tax of one dollar upon every person leaving the State by any railroad, stage-coach or other vehicle engaged or employed in the business of transporting passengers for hire."* "The proprietors, owners and corporators so engaged were required to pay the tax of one dollar for each and every person so conveyed or transported from the State. For the purpose of collecting the tax, another section required from persons engaged in such business, or their agents, a report every month, under oath, of the number of passengers so transported, and the payment of the tax to the sheriff or other proper officer." *Crandall,* the agent of a stage company, was indicted for refusal to make the required report and pay the tax. He plead that the law was unconstitutional and void; his plea being overruled by the State Court, the

case was carried on writ of error to the Supreme Court, where the judgment below was reversed—all the Judges being of opinion that the law of Nevada was unconstitutional; two of them (Chief Justice CHASE and Mr. Justice CLIFFORD) considered that the State law interfered with the regulation of commerce between the States.    The majority of the Court placed its decision upon the ground that the Nevada statute taxed every traveller for the privilege of leaving the State by any of the ordinary modes of transit, and that as the right to tax involved the right practically to prohibit, the law was an obstruction, and might, if such a power could be exercised by the State, be made a prohibition of the right of the citizen to unobstructed access to all parts of our common country, and of the right of the Federal Government to secure the presence of the citizen in any part of the Union to aid in its civil administration, or to support it in war.

Such a power was held to be inconsistent with the implied powers of the Federal Government and the rights of the citizen under the Constitution of the United States, and therefore could not be constitutionally exercised by a State.

The language used by the late Chief Justice TANEY, in his dissenting opinion in the *Passenger Cases*, 7 *Howard*, 492, is cited in the opinion of the Court as stating the ground upon which the decision of the *Nevada* case was placed, as follows: "A tax imposed by a State for entering its territories or harbors is inconsistent with the rights which belong to the citizens of other States as members of the Union, and with the object which that Union was intended to attain.    Such a power in the States could produce nothing but discord and mutual irritation, and they very clearly do not possess it."

It is very clear that the case of *Crandall vs. Nevada* fell directly within this plain and salutary rule.  The statute there under consideration imposed in terms a "capitation tax" upon every individual who left the State by a public conveyance. It was held to be a tax upon the right of the citizen to pass through or leave the State, and involved the power of pro-

hibiting the enjoyment of such right altogether. Such a power, it was decided, could not be constitutionally exercised by a State, no matter what terms the statute might employ. The Court say : " We should be very reluctant to admit that any form of words which had the effect to compel every person travelling through the country by the common and usual modes of public conveyance to pay a specific sum to the State, was not a tax upon the right thus exercised." Such was the decision of the Supreme Court in *Crandall vs. Nevada,* which being the decision of the Court of last resort, is a binding and conclusive authority upon the question.

But in our judgment there is no analogy between that case and the one before us—not the least similarity between the Nevada statute and the Acts of Assembly of Maryland which are here assailed. These do not, like the Nevada law, in terms or in fact "impose a tax for the use of the State, upon the right of the citizens to travel, at the usual and agreed rate of fare, over existing and established routes, and in existing and established conveyances." The Maryland Laws were passed in order to create new and improved modes of conveyance; to give to the traveller better, cheaper and more rapid means of transportation than before existed. It is a perversion of the intention of the Legislature, and contrary to the whole scope and meaning of the laws to construe them as imposing a tax upon travellers or an obstruction upon the right of locomotion. The whole argument of the appellee, by which it is sought to bring this case within the principle decided in *Crandall vs. Nevada,* is that the effect of the State's reservation is to increase the fare of the passenger upon the railroad ; and thus it operates indirectly as a tax upon him ; if this be so, it is no infringement of his constitutional rights. Such would be the effect of any State law imposing taxes upon the property of the company for the support of Government, as thereby the pecuniary burdens and expenses of the company would be augmented, and its rates of charges for transportation consequently increased.

The same may be said of any Act of incorporation of a railroad company, whereby a *bonus* is reserved to the State for granting the franchise; such a *bonus* might be a sum of money payable by the company in gross, or in instalments, or payable out of the receipts of the company for transportation of passengers or merchandise, *Gordon vs. Appeal Tax Court*, 3 *Howard*, 145, and yet it cannot be for a moment supposed that the State laws, requiring the payment of such taxes or *bonus* by the corporation would be repugnant to the Constitution of the United States.

In construing legislative contracts the same rule applies as in the construction of other contracts. As was said by the Supreme Court in the case of the *Binghampton Bridge*, 3 *Wallace*, 74, " they are to be construed to accomplish the intention of the parties. * * * * It is not the duty of the Court by legal subtlety to overthrow a contract; but rather to uphold it and give it effect, and no strained or artificial rule of construction is to be applied to any part of it." This rule applies with peculiar force when the contract has assumed the form of a law. In dealing with an Act of Assembly, which is alleged to be inoperative by reason of want of power in the Legislature to pass it, for supposed repugnancy to the Constitution of the State or of the United States, every intendment ought to be made in support of the law, and it is not to be declared invalid except for the plainest and most conclusive reasons.

Applying these rules of construction to these Acts of Assembly, what is their plain meaning and intent? They confer upon the defendant the franchise and power to construct the branch railroad and to collect tolls for the transportation of passengers and merchandise; the State in order to aid in the accomplishment of the work, by the Act of 1832, ch. 175, relinquished the privilege and option which had been retained under the antecedent Acts, and engaged to advance a half million of dollars, one-third of the estimated cost of the work, and to become a stockholder to that amount. The

company for these considerations stipulated to pay to the State a certain portion (one-fifth) of its gross receipts from passenger. transportation ; and at the same time the State limited and prescribed the *maximum* rates of toll to be charged by the company.   The Act of 1832 contained a proviso, that the one-fifth of the passenger fare for the whole distance, should not be less than twenty-five cents; or in other words, that the fare for a single passenger should not be less than $1.25.   By subsequent Acts this provision was repealed; and by the Act of 1852, ch. 328, which is still in force, the company is authorized to regulate the tolls to be paid for the transportation of passengers, in their discretion, not exceeding the *maximum* already fixed by law.

These Acts when accepted by the defendant, became a contract between the company and the State.   It was entered into in good faith and for a valuable and sufficient consideration.   It certainly did not enter into the imagination of the parties that it was in any respect repugnant to the Constitution.   It has been acquiesced in, and faithfully observed by the company for more than thirty years.   This Court is now called on to declare it unconstitutional and void, because it is alleged to be a law imposing a capitation tax upon passengers. Such was not the purpose of the Legislature, nor is such intention to be found in the provisions of the law.

· It seems very clear to us that the money reserved by the State is a tax upon the corporation not upon the passengers, and it is therefore not subject to any constitutional objection. The power of the State to impose such a tax or burden upon the company, with its consent, is too clear to be questioned. The corporation was created by the laws of the State, and except so far as exempted by its charter, it is subject to the jurisdiction and power of the State.   In the case of *McCullough vs. The State*, 4 *Wheaton*, 429, Chief Justice MARSHALL, in speaking of the power of taxation by a State, says: "It is obvious that it is an incident of sovereignty, and is coextensive with that to which it is incident. * * * All subjects

State *vs.* Balt. & Ohio R. R. Co.

over which the sovereign power of a State extends are objects of taxation; but those over which it does not extend are upon the soundest principles exempt from taxation. * * * The sovereignty of a State extends to everything which exists by its own authority, or is introduced by its permission."

This is the distinct and well-defined power to which we are to refer the legislation of the State now in question. Is it a tax upon the corporation? This question is answered by the terms of the law, and its whole tenor and scope. The money is payable by the company out of its own receipts. The passenger fare received by the company is simply the toll for transportation collected by virtue of its powers under the charter, these are regulated in its discretion, subject only to the limitation prescribed by the Acts of Assembly, and which the State had the undoubted power to prescribe. Under the law it is bound to render accounts of its gross revenue from passenger transportation, and to pay to the State a sum equivalent to one-fifth of the whole amount so received. The sums payable to the State are to be ascertained by reference to the amount of gross receipts or income of the company from passenger transportation, this furnishes the standard or basis of the computation. Such is our construction of the Acts of Assembly; so construed, they are wholly unlike the statute of Nevada considered in *Crandall's Case in 6 Wallace.*

They may be assimilated to the provisions in the Act of Congress, approved June 30th, 1864, ch. 173, section 103, which imposes a tax, upon railroad companies and other carriers, of a certain *per centum* upon their gross receipts. By the same process of reasoning adopted by the appellee in construing the Maryland Laws, these provisions of the Act of Congress would be construed as levying a capitation tax on passengers, and therefore unconstitutional, for Congress can no more impose such a tax constitutionally, than can a State Legislature, and it is besides prohibited by the Constitution from imposing direct taxes upon the citizen.

But the Act of Congress referred to is properly construed, as imposing a tax upon the carrier, not upon the passengers; and we think the same construction ought to be placed upon the Acts of Assembly before us.

In our opinion they are not in conflict with the Constitution of the United States, and therefore the Superior Court erred in granting the prayers of the appellee.

Upon the question raised by the demurrer to the second plea, we concur in the ruling of the Superior Court. In actions instituted by the State, it is well settled that no right of set-off exists, unless in cases where such defence is expressly allowed by statute, for the reason that the State being sovereign is not liable to be sued by an individual or corporation.

The right to sue the State was given by the Act of 1786, ch. 53, but this was afterwards repealed and the right taken away.

This immunity belongs to the State by reason of her prerogative as a sovereign, and on grounds of public policy. Parties having claims or demands against her, must present them through another department of the Government—the Legislature—and cannot assert them by suit in the Courts. For the same reason a right of set-off against the State does not exist. This is in the nature of a cross-suit, the object of which is to prevent circuity of action, and it does not exist where the subject matter of the set-off could not form the ground of an independent suit. It is a remedy conferred by statutes, which do not apply to the State, as she is not expressly embraced by their provisions. For these positions we refer to *Milburn vs. Guyther*, 8 *Gill*, 93–95; *Plater vs. Scott*, 6 *G. & J.*, 121; *State vs. Bank of Md.*, 6 *G. & J.*, 225–227; *Tiernan vs. Rescaniere*, 10 *G. & J.*, 225; *State vs. Milburn*, 9 *Gill*, 118; *United States vs. Hoar*, 2 *Mason*, 312.

It is very clear that the subject matter of defence alleged in the plea cannot constitute a ground for *recoupment*, because the alleged cross-claim does not arise in any manner out of the contract or transaction which constitutes the cause of

action, but is an entirely separate and distinct claim, having no connection therewith. *Carroll's Adm'r vs. Quynn.* 13 *Md.,* 390.

It could only be relied on, if at all, under a plea of *set-off,* which, as we have said, is not a good plea in this suit, and the demurrer was properly sustained. Although it does not necessarily arise on this appeal, we have considered it proper to express our opinion upon this question, because it is presented upon the record, and in case of another trial might be again raised.

> *Judgment reversed and*
> *new trial ordered.*

(Decided 30th May, 1871.)

ALVEY, J., delivered the following opinion, in which GRA-SON, J., concurred, recognising the right of the State to recover, but not in the present form of action :

The right of the State to recover of the railroad company the tax sued for in the present action is maintained, according to the opinion of the majority of this Court, upon the assumption (which is, for the purposes of this suit, a virtual concession) of the illegality of the tax in question ; and as I do not perceive the propriety of such an assumption to maintain the right of the State, I must dissent from this mode of disposing of the case; although I entirely concur with the rest of the Court in the conclusion that the State is entitled to recover, and that the judgment appealed from should be reversed.

I shall, therefore, in a very brief way, and without at all going into an extended argument upon the subject, state my views of the two questions presented by the record before us.

And first, as to the validity of the tax sought to be recovered in this action.

This question is directly presented by the appellee's prayers, which were granted, and in the argument of it in this Court, the great effort in behalf of the company has been to show

that the tax in question is of the character of that declared
to be unconstitutional and void, in the case of *Crandall vs.
the State of Nevada*, 6 *Wall.*, 35. But, with all proper respect
for the ability and apparent sincere conviction of the learned
counsel who argued for the company, I have been utterly una-
ble to discover the supposed resemblance of the two cases.
That reported in 6 *Wallace* was the case of a *specific* tax
levied on the traveller for the privilege of leaving the State
of Nevada by *any* of the usual and ordinary modes of travel,
the question being, as stated by the Supreme Court, the right
of a State to levy a tax upon persons residing in the State
who might wish to get out of it, and upon persons not resid-
ing in it who might have occasion to pass through it. The
State law, determined to be in conflict with the Constitution
of the United States in that case, provided that there should
be levied and collected a *capitation tax*, as such by express
denomination, of $1 *upon every person* leaving the State by
any railroad, stage-coach or other vehicle engaged or em-
ployed in the business of transporting passengers for hire, to
be collected and paid over to the State by the carriers. But
the case at bar is in all material respects different. The law
here involved certainly does not in terms impose any specific
tax upon the passenger for the right of transit, as in the Ne-
vada case; nor do I think that any ingenuity is capable of so
construing its terms as fairly to put the State in the position
of imposing a direct tax upon the right of travel, upon the
theory that though it be collected as fare, it becomes a direct
tax upon the passengers by simply making the apportionment
as between the State and the railroad company. On the con-
trary, the obvious reading of the law is, that this is a special
tax, founded on compact between the State and the railroad
company, assessed not on the passenger, but on one portion
of the company's income and profit. The company is re-
quired to pay into the treasury of the State the " one-fifth of
the whole amount which may be received " for transporting
passengers over its road; or, in other words, twenty per cent.

of the gross receipts from one particular branch of its busi-
ness; and reference is made to the passenger only by way of
limiting and regulating the amount of fare that the company
is authorized to exact, not on account of the State, but on that
of the company. It is certainly competent to the State to tax
the entire gross profits of the company, and, if so, it is equally
competent to tax any particular part of them. The tax, then,
according to my view, is imposed directly upon the profits of
the railroad company, and not upon the passenger, as con-
tended by the counsel of the company; and the passenger is
not otherwise affected by such tax than he would be by the
same amount imposed as a tax upon the bed of the road or
its rolling stock. It may be true, and no doubt is the case,
that the rates of fare fixed by the company are somewhat
enhanced by the existence of this continuing demand of the
State, but it is only as any other tax or demand upon the
company would be calculated to produce such enhancement.
The company would naturally so regulate its rates of fare as
to enable it to discharge its obligations, and to make profit
for its shareholders besides. But, as the law now stands, and
has stood since the Act of 1852, chapter 328, the company is
only restrained from charging as fare more than the *maximum*
rate prescribed by the Act of 1832, chapter 175. Under that
sum, it has full and complete discretion over the rates of fare,
and the State is only entitled to the one-fifth, or twenty per
cent. of the smallest amount that the company may think
proper to exact from the passenger as fare. And if the law
imposing the tax now sued for were to be declared void, it by
no means follows, as a necessary consequence, that the rail-
road company would lessen its rate of fare; no one can con-
fidently predict such a result; and it is certainly true, that
there is no power to compel it to be done. And this being
so, what better test could be furnished of the nature of the
tax in question, and as to the party upon whom it is imposed?
Indeed, as I understand the counsel for the company, it is
not only conceded that the fare heretofore charged was legal,

but it is insisted upon as the right of the company, in its discretion, to charge and receive of the passenger any rate of fare, not exceeding the *maximum* rate allowed by the law to be charged; the illegality, therefore, supposed to exist, consisting simply in the claim of the State to share in the proceeds. Thus, in effect, at once conceding that the tax is not levied upon the passenger, but upon the income or gross profits of the company, derived from the transportation of passengers. And this tax, thus levied, the company agreed to pay to the State for most material aids and benefits conferred, and for the surrender by the Act of 1832, chapter 175, of important and valuable rights held by the State under the Acts of 1830 and 1831, recited in the Act of 1832, and without which the road could not have been made; certainly not at the time it was made.

Now seeing that this tax is not a capitation tax, or in any proper sense a direct tax upon the passenger for the right of transit, can it be successfully maintained that the law imposing it is in conflict with the Constitution of the United States, simply because the passenger may be incidentally affected by such tax, in the price of the fare he may be required to pay to the railroad company?

To maintain the affirmative of this proposition, would require that the Courts should, in all cases, inquire as to the elements upon which the rates of fare of the numerous railroad companies of the country are based, and if it be found that such rates have any reference whatever to the State taxes that may be imposed upon the company, and whereby the fare of the passenger is at all enhanced, such taxes would, therefore, have to be declared void. If such were to be the declared law, it would certainly afford an easy device by which all the railroads of the country could obtain exemption from State taxation. We may be assured, however, with reasonable certainty, that the principle of the Nevada case will never be carried to such an extent.

I shall add nothing more upon this question, except to refer to the case of *The Commonwealth vs. The Railroads,* known as *the Tonnage Tax Cases,* in 62 *Penn. St. Rep.,* 286, in which there is a well-reasoned opinion of the Supreme Court of Pennsylvania, upon a question of a kindred nature to that presented in this case. Much of the reasoning in that case applies here, and the most material parts of the argument advanced for the company in this case will be found to be well answered by that opinion.

With these views, I fully concur in opinion with the other members of the Court, that there was error committed by the Court below, in granting the prayers offered on the part of the appellee—the railroad company.

The next question is, has the State the right to recover this tax of the railroad company in an action simply for money had and received? and it is in reference to this part of the case that I differ from the rest of the Court.

Assuming the tax to be valid, and that it is levied upon the profits and income of the company, I think it clear that the action for money had and received is inapplicable, and cannot be maintained. I take it to be free from doubt, that the money recoverable in this form of action should have been *originally received* by the defendant to the plaintiff's use, or, at the time of the action brought, *it should have belonged to the plaintiff,* and not to the defendant in his own right. That is not the case here. If I am right in supposing the tax to be levied upon the company, and not upon the passenger, the arrears of taxes become an ordinary debt due from the company to the State, and there can be no pretence that the money sought to be recovered in the present action was ever received to the use of the State, or that the company ever held it as belonging to the State, and as distinguished from money held in its own right. If, on the other hand, it be assumed, as has been done for the purpose of maintaining this form of action, that the levy is directly upon the passenger, and that the railroad company is merely the collector of the

taxes for the State, then it may be conceded that the action for money had and received would lie.

But being of opinion, as we all are, that the levy is not upon the passenger, but upon the company, I must confess I am at a loss to understand why we should not put the judgment of this Court upon the proper ground upon which the State is entitled to recover. To adjudge the right to recover upon the mere assumption that the tax is levied directly upon the passenger, and is therefore illegal, as stated in the plaintiff's first prayer, when we determine that in truth it is not so, would seem to be placing the State in a false position with respect to her rights. The question here is, not what would be the right of the State against the company in the event of the tax being decided illegal, but what is her right, and upon what ground is she entitled to recover, declaring, as we do, the tax to be constitutional and valid. I think the State ought rather to recover as for a valid tax levied upon the company, than as for an assumed illegal one levied upon the passenger and collected by the company. And with the views entertained by this Court in regard to the main question involved, that of the constitutionality of the law imposing the tax, I think we ought not to say of the plaintiff's prayers that they were erroneously rejected by the Court below, as they raised directly the question of the applicability of the form of action to the right asserted by the State under the law imposing the tax.

I am therefore of opinion, that the judgment appealed from should be reversed for the error committed in granting the prayers on the part of the defendant, and that the cause be remanded in order that the State may obtain leave and amend its declaration, so as to entitle it to recover upon the true ground upon which the tax is due, that is, as a tax levied upon and due from the company.

The law having created the claim in favor of the State against the company, and given no specific remedy for its collection, an *assumpsit* exists upon which the State is entitled

to recover in an action of *assumpsit,* but it must be upon a declaration properly framed, and not as for money had and received.   See the case of *The Mayor and City Council of Balto. vs. Howard,* 6 *Har. & John.*, 383.

I am authorized by Judge GRASON to say, that he concurs with me in this opinion.